1  Celeste M. Brecht (State Bar No. 238604)
   JONES DAY
2  555 South Flower Street, Floor 50
   Los Angeles, CA 90071
3  Telephone:   +1.213.489.3939
   Facsimile:   +1.213.243.2539
4  Email:        cbrecht@jonesday.com

5  *Attorneys for Defendant*
   CHEVRON U.S.A. INC.
6

7

8              **UNITED STATES DISTRICT COURT**

9            **NORTHERN DISTRICT OF CALIFORNIA**

10

11 BILLY HAWKINS,

12             *Plaintiff,*              **DECLARATION OF CELESTE M.
                                         BRECHT IN SUPPORT OF DEFENDANT
13      v.                               CHEVRON U.S.A. INC.'S NOTICE OF
                                         REMOVAL**
14 SYNGENTA CROP PROTECTION, LLC;
   SYNGENTA AG; AND CHEVRON U.S.A.       Complaint Filed: July 12, 2022
15 INC.                                  Action Removed: July 13, 2022
                                         Trial Date: None Set
16             *Defendants.*

17

18            **DECLARATION OF CELESTE M. BRECHT**

19 I, Celeste M. Brecht, hereby declare and state as follows:

20      1.      I am a partner with the law firm Jones Day, counsel for Defendant Chevron

21 U.S.A. Inc. in the above-referenced case.  I am a member in good standing of the State Bar of

22 California.  I have personal knowledge of the facts set forth in this declaration and, if called as a

23 witness, could and would testify completely thereto.

24      2.      This declaration is in support of Defendant Chevron U.S.A. Inc.'s Notice of

25 Removal.

26      3.      Attached hereto as **Exhibit A** is a true and correct copy of all process, pleadings,

27 and orders that are available in the underlying matter.

28

---

1    4.    Attached hereto as **<u>Exhibit B</u>** is a true and correct copy of the State civil case

2  cover sheet and Register of Actions, reflecting all filings and activity to date.

3    I declare under penalty of perjury under the laws of the United States of America that the

4  foregoing is true and correct.  Executed on July 13, 2022, in Columbus, Ohio.

5

6                            *s/ Celeste M. Brecht*
                            CELESTE M. BRECHT

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF CELESTE M. BRECHT ISO NOTICE OF REMOVAL

# EXHIBIT A

1  DENNIS C. REICH (CA SBN: 69631)
2  dreich@reichandbinstock.com
3  REICH & BINSTOCK LLP
4  4265 San Felipe St., #1000
5  Houston, Texas 77027
6  Telephone: (713) 622-7271
7  Facsimile: (713) 623-8724

ELECTRONICALLY
**F I L E D**
*Superior Court of California,*
*County of San Francisco*

**07/12/2022**
**Clerk of the Court**
BY: KAREN VALDES
Deputy Clerk

## SUPERIOR COURT OF THE STATE OF CALIFORNIA
## COUNTY OF SAN FRANCISCO

BILLY HAWKINS,

Plaintiff,

v.

SYNGENTA CROP PROTECTION, LLC;
SYNGENTA AG; and
CHEVRON U.S.A., INC.,

Defendants.

Civil Action No.:

**CGC-22-600636**

**ORIGINAL COMPLAINT**
[Complex] [Personal Injury]

JURY TRIAL DEMANDED

Plaintiff, **BILLY HAWKINS**, brings this Complaint for damages against Defendants **SYNGENTA CROP PROTECTION, LLC; SYNGENTA AG**; and **CHEVRON U.S.A., INC.**, alleging as follows:

### I.   **Nature of the Case**

1.      This case arises out of Defendants' wrongful conduct in connection with the design, development, manufacture, testing, packaging, promoting, marketing, advertising, distribution, and sale of Paraquat dichloride, also known as Paraquat methosulfate ("Paraquat"), the active ingredient in herbicide products that cause Parkinson's disease and renal disease. As a result, Paraquat is dangerous to human health and unfit to be marketed and sold in commerce, particularly without proper warnings

1
PLAINTIFF'S ORIGINAL COMPLAINT

1   and directions as to the dangers associated with its use. Plaintiff was exposed to Paraquat

2   for a sustained period and suffered permanent physical injury as a result thereof.

3                                   **II.    Parties**

4        2.      Plaintiff, Billy Hawkins, is a natural person and is a resident and citizen

5   of the State of Tennessee. Plaintiff brings this action for personal injuries sustained by

6   exposure to the active ingredient Paraquat in Defendants' Paraquat products that

7   occurred within the State of California while Plaintiff was a resident and citizen of

8   California.

9        3.      Defendant Syngenta Crop Protection, LLC ("SCP") is a Delaware limited

10  liability company with its principal place of business in at 410 South Swing Road,

11  Greensboro, North Carolina 27409-2012. SCP is a subsidiary of Syngenta Seeds.

12       4.      SCP advertises, promotes, markets, sells, and distributes Paraquat and

13  other herbicides and pesticides to distributors, dealers, applicators, and farmers,

14  including in the State of California.

15       5.      Defendant Syngenta AG is a corporation organized and existing under the

16  laws of Switzerland, with its principal place of business at Schwarzwaldallee 215, 4058

17  Basel-Stadt, Switzerland.

18       6.      Syngenta AG was formed in 2000 as a result of the merger of Novartis

19  Agribusiness and Zeneca Agrochemicals. Syngenta AG was a publicly traded company

20  on the Swiss stock exchange; American Depositary Receipts for Syngenta AG were traded

21  on the New York Stock Exchange until it was acquired by ChemChina, a Chinese state-

22  owned entity, in 2017. It has since been de-listed. On information and belief, Syngenta

AG continues to operate as a separate unit of ChemChina. Syngenta AG wholly owns, through its ownership of Syngenta Seeds, SCP.

7.     Syngenta AG represents itself as a global company. According to Syngenta's website, Syngenta AG's Board of Directors "has full and effective control of the company and holds ultimate responsibility for the company strategy."

8.     One or more members of Syngenta AG's Board of Directors or the Executive Committee established by the Board of Directors also serve as member(s) of the Board of Directors of SCP and/or Syngenta Seeds.

9.     Syngenta AG's Executive Committee formulates and coordinates the global strategy for Syngenta businesses, and maintains central corporate policies requiring Syngenta subsidiaries, including SCP, to operate under the general guidance of the Syngenta group control.

10.     Employees of the Syngenta group maintain reporting relationships that are not defined by legal, corporate relationships, but instead cross those corporate lines.

11.     SCP is subject to additional oversight requiring it to seek approval for certain decisions from higher levels within the functional reporting structure—including, in some instances, Syngenta AG. SCP's appointments of senior management personnel also may require, in some instances, approval from individuals or governing bodies that are higher than SCP's board of directors.

12.     Also, Syngenta AG maintains a central global finance function that governs SCP, which requires SCP to function under the Syngenta AG umbrella and not independently.

PLAINTIFF'S ORIGINAL COMPLAINT

1    13.    Additionally, SCP regularly refers to itself as "Syngenta," with no further

2    description.

3    14.    Chevron U.S.A., Inc. ("CUSA") is a Pennsylvania corporation with its

4    principal place of business in San Ramon, California.

5    ### III.    Jurisdiction and Venue

6    15.    This Court has jurisdiction over SCP because it has sufficient minimum

7    contacts with the State of California and has purposefully availed itself of the privileges

8    of conducting business in California. SCP knows that its Paraquat products are and were

9    sold throughout the State of California. SCP also maintains sufficient contacts with the

10   State of California that this Court's exercise of personal jurisdiction over it does not offend

11   traditional notions of fair play and substantial justice. Specific to this case, SCP engaged

12   in the business of developing, manufacturing, testing, packaging, marketing,

13   distributing, and labeling pesticides containing Paraquat in California, thus making a

14   lawsuit regarding Paraquat filed in California foreseeable. SCP purposefully availed itself

15   of the privilege of conducting activities within California, thus invoking the benefits and

16   protections of its laws.

17   16.    This Court has personal jurisdiction over Syngenta AG for because, as

18   stated above, the jurisdictional contacts of SCP in this state are attributable to Syngenta

19   AG due to the unusually high degree of control Syngenta AG exercises over these

20   subsidiaries. In addition, on information and belief, Syngenta AG and SCP acted in

21   concert under agreements or other arrangements to act in a collective manner and/or as

22   joint venturers regarding the actions and events made the subject of this Complaint.

PLAINTIFF'S ORIGINAL COMPLAINT

1    Syngenta AG and SCP are therefore jointly and severally liable for the acts for which the

2    Plaintiff complains.

3         17.    In fact, in 2011 the U.S. District Court for the Southern District of Illinois

4    held that Syngenta AG's unusually high degree of control made Syngenta Crop

5    Protection the agent or alter ego of Syngenta AG and therefore subjected Syngenta AG to

6    jurisdiction in the State of Illinois. *See City of Greenville, Ill. v. Syngenta Crop Prot., Inc.*, 830

7    F. Supp. 2d 550 (S.D. Ill. 2011).

8         18.    This Court has jurisdiction over CUSA because CUSA maintains its

9    principal place of business in San Ramon, California.

10        19.    This Court also has personal jurisdiction over CUSA because CUSA

11   advertises and sells goods, specifically pesticides containing Paraquat, throughout the

12   State of California. It derived substantial revenue from goods and products used in

13   California. It expected its acts to have consequences within the State of California,

14   including the foreseeable possibility of a lawsuit filed in California, and derived

15   substantial revenue from interstate commerce. CUSA purposefully availed itself of the

16   privilege of conducting activities within the State of California, thus invoking the benefits

17   and protections of its laws.

18        20.    Venue is proper in San Francisco, California because the acts and omissions

19   giving rise to CUSA's liability in this case—decisions about the manufacture,

20   formulation, distribution, and sale of the products that caused Plaintiff's injuries—

21   occurred during the years 1964 to 1986, while CUSA (through its successor entities) were

22   headquartered at 555 and 575 Market Street in San Francisco, California.

PLAINTIFF'S ORIGINAL COMPLAINT

## IV.    Tolling of Applicable Statute of Limitations

**a.    <u>Discovery Rule Tolling</u>**

21.    Plaintiff did not know and had no way of knowing about the risk of serious illness associated with exposure to Paraquat until after November 2021.

22.    Within the period of any applicable statutes of limitations, Plaintiff could not have discovered, through the exercise of reasonable diligence, that exposure to Paraquat is injurious to human health.

23.    Plaintiff did not discover and did not know the facts that would cause a reasonable person to suspect the risks associated with exposure to Paraquat; nor would a reasonable and diligent investigation by Plaintiff have disclosed that Paraquat would cause or had caused Plaintiff's injuries.

24.    For these reasons, all applicable statutes of limitations have been tolled by operation of the discovery rule with respect to Plaintiff's claims.

**b.    <u>Fraudulent Concealment Tolling</u>**

25.    All applicable statutes of limitations have also been tolled by Defendants' knowing and active fraudulent concealment and denial of the facts alleged herein throughout the period relevant to this action.

26.    Instead of disclosing critical safety information about Paraquat, Defendants consistently and falsely represented the safety of Paraquat, and those false representations prevented Plaintiff from discovering this claim.

c.    Estoppel

27.    Defendants were under a continuous duty to disclose to consumers, users, and other persons coming into contact with its products, including Plaintiff, accurate safety information concerning its products and the risks associated with the use of and/or exposure to Paraquat.

28.    Instead, Defendants knowingly, affirmatively, and actively concealed safety information concerning Paraquat as well as the serious risks associated with the use of and/or exposure to its products.

29.    Defendants are thus estopped from relying on any statutes of limitations in defense of this action.

## V.    Factual Allegations

a.    Development of Paraquat

30.    The herbicidal properties of Paraquat were discovered by Imperial Chemical Industries PLC ("ICI") in 1955.[1]

31.    ICI developed, researched, manufactured, and tested Paraquat through its Central Toxicology Laboratory in the early 1960s and produced the first chemical Paraquat formulation, which it registered in England and introduced in certain markets under the brand name GRAMOXONE®, in 1962.

32.    ICI was awarded a U.S. patent on herbicide formulations containing Paraquat as an active ingredient in 1962.

---

[1] Sagar, G.R., *Uses and Usefulness of Paraquat*, Human Toxicology (1987) 6:1, 7-11.

33.     ICI's Central Toxicology Laboratory performed and submitted the health and safety studies of Paraquat to the United States Department of Agriculture ("USDA") and the United States Environmental Protection Agency ("EPA") to secure and maintain the registration of Paraquat and other pesticides for use in the United States.

34.     In or around 1964, ICI entered into a licensing and distribution agreement with Chevron Chemical Company ("Chevron") to sell Paraquat in the United States. Under this ICI-Chevron Agreement, Chevron obtained an exclusive license to the patents and technical information to permit Chevron to formulate or have formulated, use, and sell Paraquat under the trade name GRAMOXONE® and other names in the United States and to sub-license others to do so. Some form of this agreement remained in effect until September 1986 when ICI paid Chevron for the early termination of its rights under the Paraquat licensing and distribution agreement.

35.     Through a long series of mergers, spin-offs, and related corporate transactions, ownership of ICI's Central Toxicology Laboratory was transferred to Syngenta Ltd., a wholly owned British subsidiary of Syngenta AG. Since that time, Syngenta Ltd.'s Central Toxicology Laboratory has continued to perform and submit health and safety studies to the EPA to secure and maintain the registration of Paraquat and other pesticides in the United States.

36.     Through the same long series of mergers, spin-offs, and related corporate transactions, ICI's agrochemical business was transferred to SCP.

37.     From approximately September 1986 through the present, Syngenta has:

PLAINTIFF'S ORIGINAL COMPLAINT

a.   manufactured Paraquat for use as an active ingredient in herbicides formulated and distributed for sale and use in the United States, including the State of California;

b.   distributed Paraquat for use as an active ingredient in herbicides formulated and distributed for sale and use in the United States, including the State of California;

c.   formulated Paraquat products distributed for sale and use in the United States, including the State of California; and

d.   distributed Paraquat products for sale and use in the United States, including the State of California.

38.   Syngenta, through SCP, is now the leading manufacturer of Paraquat, which it sells under the brand name GRAMOXONE®.[2]

**b.   Paraquat Use**

39.   Paraquat is designed to kill broadleaf weeds and grasses before the planting or emergence of more than 100 field, fruit, vegetable, and plantation crops, to control weeds in orchards, and to desiccate (dry) plants before harvest.

40.   Paraquat products are commonly sprayed multiple times per year on the same land, particularly when used to control weeds in orchards or on farms with multiple crops planted on the same land within a single growing season or year. This type of use was as intended, directed, or at least foreseeable.

41.   Paraquat is typically sold by Defendants to end-users in the form of a liquid concentrate (and less commonly in the form of granular solids) designed to be diluted with water before or after loading it into the tank of a sprayer, and applied by spraying it onto target weeds.

---

[2] Press Release, Federal Trade Commission, FTC Requires China National Chemical Corporation and Syngenta AG to Divest U.S. Assets as Condition of Merger (April 4, 2017), https://www.ftc.gov/news-events/press-releases/2017/04/ftc-requires-china-national-chemical-corporation-syngenta-ag.

PLAINTIFF'S ORIGINAL COMPLAINT

42.     Paraquat concentrate is formulated with one or more "surfactants" to increase the ability of the herbicide to stay in contact with the leaf, penetrate the leaf's waxy surface, and enter into plant cells, and the accompanying instructions typically told end-users to add a surfactant or crop oil (which typically contains a surfactant) before use.

43.     Paraquat products are typically applied with a knapsack sprayer, hand-held sprayer, aircraft (*i.e.*, crop duster), truck with a pressurized tank, or tractor-drawn pressurized tank. This type of use was as intended, directed, or at least foreseeable.

**c.      Paraquat Exposure**

44.     Each year, Paraquat is applied to approximately 15 million acres of agricultural crops, including corn, soybeans, wheat, cotton, fruit and vegetables, rice, orchards and grapes, alfalfa, hay, and other crops.

45.     The following map demonstrates the nationwide use of Paraquat in recent years[3]:

---

[3] USGS, Pesticide National Synthesis Project (2020), https://water.usgs.gov/nawqa/pnsp/usage/maps/show_map.php? year=2017&map=PARAQUAT&hilo=L&disp= Paraquat.

PLAINTIFF'S ORIGINAL COMPLAINT

**Estimated Agricultural Use for Paraquat , 2017**
**EPest-Low**

Estimated use on
agricultural land, in
pounds per square mile
☐ < 0.05
☐ 0.05 - 0.50
☐ 0.51 - 2.99
■ > 2.99
☐ No estimated use

46.    At all relevant times, it was reasonably foreseeable that applicators of Paraquat and others nearby would be exposed to it when Paraquat was used in its intended, directed, and/or foreseeable manner, including mixing, loading, spraying, or cleaning.

47.    At all relevant times it was reasonably foreseeable that users and others nearby would be exposed to Paraquat through contact with skin, breathing it in, and/or ingesting it.

48.    Parkinson's disease is a terrible disease classified as a progressive neurodegenerative disorder of the brain that affects primarily the motor system, the part of the central nervous system that controls movement.

49.    Parkinson's Disease is now one of the fastest growing neurological condition diagnoses on the planet.

50.     In a 2018 study by the Parkinson's Project, it is estimated that 1.2 million Americans will have been diagnosed with Parkinson's by the year 2030.[4]

51.     The characteristic symptoms of Parkinson's disease are its "primary" motor symptoms: resting tremor (shaking movement when the muscles are relaxed); bradykinesia (slowness in voluntary movement and reflexes); rigidity (stiffness and resistance to passive movement); and postural instability (impaired balance).

52.     The primary motor symptoms of Parkinson's disease typically result in "secondary" motor symptoms such as freezing of gait; shrinking handwriting; mask-like expression; slurred, monotonous, quiet voice; stooped posture; muscle spasms; impaired coordination; difficulty swallowing; and excess saliva and drooling caused by reduced swallowing movements.

53.     Non-motor symptoms are present in most cases, often for years before the primary motor symptoms appear. These non-motor symptoms include but are not limited to loss of or altered sense of smell; constipation; low blood pressure on rising to stand; sleep disturbances; and depression.

54.     There is currently no cure for Parkinson's disease. Existing treatments do not slow or stop its progression; such treatments are capable only of temporarily and partially relieving the motor symptoms. These treatments also have unwelcome side effects the longer they are used.

---

[4] Marras, C., Beck, J.C., Bower, J.H. et al., *Prevalence of Parkinson's disease across North America*, njp Parkinson's Disease 4: 21 (2018). https://doi.org/10.1038/s41531-018-0058-0.

55.     One of the primary pathophysiological hallmarks of Parkinson's disease is the selective degeneration and death of dopaminergic neurons (dopamine-producing nerve cells) in a part of the brain called the substantia nigra pars compacta ("SNpc").

56.     Dopamine is a neurotransmitter (a chemical messenger that transmits signals from one neuron to another neuron, muscle cell, or gland cell) that is critical to the brain's control of motor function (among other things).

57.     The death of dopaminergic neurons in the SNpc decreases the production of dopamine.

58.     Once dopaminergic neurons die, the body cannot replace them. When enough dopaminergic neurons die, dopamine production falls below the level the brain requires to properly control motor function, thus resulting in the motor symptoms of Parkinson's disease.

59.     The presence of Lewy bodies (insoluble aggregates of a protein called alpha-synuclein) in many of the remaining dopaminergic Neurons in the SNpc is another of the primary pathophysiological hallmarks of Parkinson's disease.

60.     Dopaminergic neurons are particularly susceptible to oxidative stress, a disturbance in the normal balance between oxidants present in cells and cells' antioxidant defenses.

61.     Oxidative stress is a major factor in—if not the precipitating cause of—the degeneration and death of dopaminergic neurons in the SNpc and the accumulation of Lewy bodies in the remaining dopaminergic neurons that are the primary pathophysiological hallmarks of Parkinson's disease.

62.     Paraquat is highly toxic to plants and animals.

63.     Paraquat is designed to injure and kill plants by creating oxidative stress, which causes or contributes to cause the degeneration and death of plant cells.

64.     Similarly, Paraquat injures and kills animals by creating oxidative stress, which causes or contributes to cause the degeneration and death of animal cells.

65.     Paraquat creates oxidative stress in the cells of plants and animals because of "redox properties" that are inherent in its chemical composition and structure—it is a strong oxidant and readily undergoes "redox cycling" in the presence of molecular oxygen, which is plentiful in living cells.

66.     The redox cycling of Paraquat in living cells interferes with cellular functions that are necessary to sustain life—with photosynthesis in plant cells and with cellular respiration in animal cells.

67.     The redox cycling of Paraquat in living cells creates a "reactive oxygen species" known as a superoxide radical, an extremely reactive molecule that can initiate a cascading series of chemical reactions that creates other reactive oxygen species that damage lipids, proteins, and nucleic acids, which are molecules that are essential components of the structures and functions of living cells.

68.     Because the redox cycling of Paraquat can repeat indefinitely in the conditions typically present in living cells, a single molecule of Paraquat can trigger the production of countless molecules of destructive superoxide radical.

69.     Paraquat's redox properties have been known within the science community since at least the 1930s.

PLAINTIFF'S ORIGINAL COMPLAINT

70.     The same oxidation and redox potentials that make Paraquat highly toxic to plant cells and other types of animal cells make Paraquat highly toxic to nerve cells, including dopaminergic neurons, and create a substantial risk to all persons exposed to Paraquat.

71.     The scientific community has known since the 1960s that Paraquat is toxic to the cells of plants, animals, and humans because it creates oxidative stress through redox cycling.

72.     The surfactants with which the concentrates containing Paraquat manufactured, distributed, and sold by Defendants, Defendants' corporate predecessors, and others with whom they acted in concert were likely to increase Paraquat's toxicity to humans by increasing its ability to stay in contact with or penetrate the skin, mucous membranes, and other epithelial tissues, including tissues of the mouth, nose and nasal passages, trachea, and conducting airways, the lungs, and the gastrointestinal tract.

73.     Because Paraquat is highly poisonous, the form that is marketed in the United States has a blue dye to keep it from being confused with beverages such as coffee, a sharp odor to serve as a warning, and an added agent to cause vomiting if someone drinks it.

74.     Paraquat is a "restricted use pesticide" under federal law, *see* 40 C.F.R. § 152.175, which means it is "limited to use by or under direct supervision of a certified applicator."

75.     The same redox properties that make Paraquat toxic to plant cells and other types of animal cells make it toxic to dopaminergic neurons.  That is, Paraquat is a strong

1  oxidant that interferes with the function of dopaminergic neurons, damages those

2  neurons, and ultimately kills them by creating oxidative stress through redox cycling.

3      76.    Although Parkinson's disease is not known to occur naturally in any species

4  other than humans, Parkinson's disease research is often performed using "animal

5  models," in which scientists use Paraquat to artificially produce the symptoms of

6  Parkinson's disease in animal test subjects.

7      77.    Paraquat is one of only a handful of toxins that scientists use to produce

8  animal models of Parkinson's disease.

9      78.    In animal models of Parkinson's disease, hundreds of studies involving

10  various routes of exposure have found that Paraquat creates oxidative stress that results

11  in: the degeneration and death of dopaminergic neurons in the SNpc; other

12  pathophysiology consistent with that seen in human Parkinson's disease; and motor

13  deficits and behavioral changes consistent with those commonly seen in human

14  Parkinson's disease.

15      79.    Hundreds of *in vitro* studies (experiments in test tube, culture dish, or other

16  controlled experimental environment) have found that Paraquat creates oxidative stress

17  that results in the degeneration and death of dopaminergic neurons (and many other

18  types of animal cells).

19      80.    For instance, Dr. Afonso Bainy published a study in 1994 concluding that

20  Paraquat in vitro exposure led to an increment in the anti-oxidant capacity of the red

blood cell.[5] Additionally, Dr. Gabriele Schmuck published a study in 2002 concluding that cortical neurons were found to be more sensitive towards Paraquat toxicity than astrocytes as shown by MTT and Neutral Red assay, two different cytotoxicity assays.[6] Dr. Liyan Hou also published a study in 2019 showing that Paraquat and Maneb exposure induced ferroptosis, a form of regulated cell death, in SHSY5Y dopaminergic cells.[7]

81.    Furthermore, many epidemiological studies (studies of the patterns and causes of disease in defined populations) have found an association between Paraquat exposure and Parkinson's disease, including multiple studies finding a two- to five-fold or greater increase in the risk of Parkinson's disease in populations with occupational exposure to Paraquat compared to populations without such exposure.

82.    In June 2011, Dr. Caroline Tanner published a study examining whether pesticides that cause mitochondrial dysfunction or oxidative stress, including Paraquat, were associated with Parkinson's Disease or clinical features of parkinsonism in humans.[8] The study found that Paraquat use plays a role in human Parkinson's Disease and that "[b]ecause Paraquat remains one of the most widely used herbicide worldwide (Frabotta 2009), this finding potentially has great public health significance."[9]

---

[5] Bainy, AC, et al, *Influence of lindane and Paraquat on oxidative stress-related parameters of erythrocytes in vitro,* Human & Experimental Toxicology (1994), 13:7 461-465.

[6] Schmuck, G, et al, *Oxidative stress in rat cortical neurons and astrolytes induced by Paraquat in vitro.* Neurotoxicity Research (2002) 4:1, 1-13.

[7] Hou L, et al, *NADPH oxidase regulates Paraquat and maneb-induced dopaminergic neurodegeneration through ferroptosis,* Toxicology (2019), 1:417 64-73.

[8] Tanner, Caroline M., et al., *Rotenone, Paraquat, and Parkinson's disease.* 119 Environ Health Perspect. 866-872 (2011).

[9] *Id.*

1   83.     In November 2012, Dr. Samuel Goldman published a study entitled

2   "Genetic Modification of the Association of Paraquat and Parkinson's Disease."[10] The

3   study found that those who applied Paraquat and had the GSTT1*0 genotype were 11.1

4   times more likely to develop Parkinson's disease. Paraquat damages neurons by

5   generating oxidative stress through redox cycling; the GSTT1 gene encodes an enzyme

6   that prevents redox cycling. Around 20% of Caucasians do not have the GSTT1 gene and

7   thus have the GSTT1*0 genotype. The lack of the GSTT1 gene may cause those with the

8   GSTT1*0 genotype to be more vulnerable to Paraquat's redox cycling mechanism and

9   therefore more likely to develop Parkinson's.

10   84.     In July 2002, Dr. Alison McCormack published a study examining the effect

11   of Paraquat on mice.[11] The study found that Paraquat injections selectively kill

12   dopaminergic neurons in the SNpc.

13   85.     Dr. Robert Nisticó published a study in April 2011 that concluded that

14   Paraquat causes the cell death of dopaminergic neurons within the substantia nigra,

15   serotonergic neurons within the raphe nuclei, and noradrenergic neurons within the

16   locus coeruleus.[12] The researchers noted that Parkinson's pathology begins in the SNpc

17   and "progressively involves noradrenergic and serotonergic neurons within the locus

18   coeruleus and raphe nuclei."

---

[10] Samuel M. Goldman et al., *Genetic Modification of the Association of Paraquat and Parkinson's Disease*, 27 Mov.t Disord. 1652-1658 (2012).

[11] Alison L. McCormack et al., *Environmental Risk Factors and Parkinson's Disease: Selective Degeneration of Dopaminergic Neurons Caused by the Herbicide Paraquat* 10 Neurobiol. Dis. 119-127 (2002).

[12] R. Nisticó et al., *Paraquat- and Rotenone-Induced Models of Parkinson's Disease*, 24 Int. J. Immunopathol. Pharmacol. 313-322 (2011).

1    86.    In December 2011, Dr. Phillip Rappold published a study demonstrating

2    how Paraquat entered dopaminergic neurons and killed the neurons through oxidative

3    stress.[13] Paraquat converted to $PQ^+$, which entered dopaminergic neurons through their

4    dopamine transporters. $PQ^+$ then also reacted with dopamine, which enhanced the

5    Paraquat-induced oxidative stress. The researchers argued that dopaminergic neurons

6    are more vulnerable to Paraquat because $PQ^+$ reacts with dopamine to increase oxidative

7    stress.

8    87.    In November 2012, Dr. Pei-Chen Lee published a study examining the

9    associations between traumatic brain injuries, Paraquat, and Parkinson's disease.[14] The

10   study found an association between Paraquat exposure and Parkinson's.

11   88.    In May 2013, Dr. Gianni Pezzoli published a meta-analysis examining seven

12   studies on Paraquat exposure.[15] The meta-analysis evaluated the seven studies together

13   and separately evaluated the highest quality studies; in both analyses, those exposed to

14   Paraquat were more likely to develop Parkinson's disease.

15   89.    In a memorandum from March 2, 2016 recommending mitigation measures

16   for Paraquat, the EPA acknowledged the numerous studies linking Paraquat to

---

[13] Phillip M. Rappold et al., *Paraquat Neurotoxicity is Mediated by the Dopamine Transporter and Organic Cation Transporter-3,* 108 Proc. Natl. Acad. Of Sci. U.S.A. 20766-20771 (2011).

[14] Pie-Chen Lee et al., *Traumatic Brain Injury, Paraquat Exposure, and their Relationship to Parkinson Disease*, 79 Neurology 2061-2066 (2012).

[15] Gianni Pezzoli & Emanuele Cereda, *Exposure to Pesticides or Solvents and Risk of Parkinson Disease*, 80 Neurology 2035-2041 (2013)

PLAINTIFF'S ORIGINAL COMPLAINT

1   Parkinson's disease stating, "[t]here is a large body of epidemiology data on Paraquat

2   dichloride use and Parkinson's disease."[16]

3       90.     The kidney is the main organ responsible for Paraquat excretion and

4   Paraquat is known to be highly nephrotoxic. Dermal exposure to Paraquat has revealed

5   inflammatory cell infiltration, tubular necrosis and diffuse interstitial fibrosis.[17] Paraquat

6   causes toxic chemical reactions to occur in the kidneys, and long-term effects, including

7   kidney failure, are possible.[18] In fact, extensive exposure to Paraquat, like that

8   experienced by Plaintiff, has been shown to more than double the risk of end stage renal

9   disease.

10      91.     Switzerland, where Syngenta AG maintains its headquarters, has not only

11  prohibited the use of Paraquat since 1989 but recently amended the law on chemical

12  substances to prohibit the export of Paraquat to help protect the health and environment

13  in importing countries, particularly in the developing world.[19]

14      92.     The Ministry of Agriculture of the People's Republic of China classifies

15  Paraquat as extremely toxic. Paraquat's use or sale in China has been prohibited since

16  September 1, 2020.[20]

---

[16] Environmental Protection Agency, Paraquat Dichloride; Proposed Mitigation Decision (March 2, 2016), https://www.regulations.gov/document/EPA-HQ-OPP-2011-0855-0031.

[17] Tungsanga K, Chusilp S, Israsena S, Sitprija V. Paraquat poisoning: evidence of systemic toxicity after dermal exposure. Postgrad Med J 1983; 59(691):338-9.dd

[18] Centers for Disease Control and Prevention, Facts About Paraquat, https://emergency.cdc.gov/agent/Paraquat/basics/facts.asp.

[19] *Switzerland bans the export of five toxic chemicals, including Paraquat*, MercoPress (October 16, 2020 09:20 UTC), https://en.mercopress.com/2020/10/16/switzerland-bans-the-export-of-five-toxic-chemicals-including- Paraquat.

[20] Business Wire, *2018 Market Research on Paraquat in China*, AP, (September 10, 2018), https://apnews.com/press-release/pr-businesswire/0625d4cb368247b38ea803ff3842c203.

PLAINTIFF'S ORIGINAL COMPLAINT

93.   Paraquat use has been banned in the European Union since 2007.[21]

94.   The manufacture, formulation, and distribution of herbicides, such as Paraquat, are regulated under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), 7 U.S.C. § 136 *et seq*. FIFRA requires that all pesticides be registered with the Environmental Protection Agency ("EPA") before their distribution, sale, or use, except as described by FIFRA 7 U.S.C. § 136a(a).

95.   The EPA requires the registrant of a pesticide to conduct a variety of tests as part of the registration process to evaluate the potential for exposure to pesticides, toxicity to people and other potential non-target organisms, and other adverse effects on the environment.

96.   Registration by the EPA is not an assurance or finding of safety. The determination the EPA makes in registering or re-registering a product is not that the product is "safe," but rather that use of the product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment." 7 U.S.C. § 136(a)(c)(5)(D).

97.   FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(bb). FIFRA thus requires the EPA to make a risk/benefit analysis in determining whether a registration should be granted or allowed to continue to be sold in commerce.

---

[21] *EU Court Reimposes Ban on Paraquat Weedkiller*, Reuters, July 11, 2007, https://www.reuters.com/article/environment-eu-Paraquat-dc/eu-court-reimposes-ban-on-Paraquat-weedkiller- idUSL1166680020070711.

1   98.   FIFRA generally requires that the registrant conduct health and safety

2   testing of pesticides. The government is not required to, nor does it generally, perform

3   the product tests that are required of the manufacturer.

4   99.   Syngenta has long misrepresented and denied the harmful side effects of its

5   Paraquat-based products.

6   100.   In response to growing concern about the safety of Paraquat, Syngenta

7   established a website at www.paraquat.com for the purpose of persuading the public that

8   Paraquat is safe.

9   101.   Syngenta's statements proclaiming the safety of Paraquat and disregarding

10   its dangers were designed to mislead the agricultural community and the public at large,

11   including Plaintiff.

12   102.   Defendants knew or should have known that Paraquat was a highly toxic

13   substance that can cause severe neurological injuries and impairment.

14   103.   Defendants failed to appropriately and adequately test its Paraquat-based

15   products to protect individuals like Plaintiff from the hazards of exposure to Paraquat.

16   104.   Despite its knowledge that exposure to Paraquat was dangerous,

17   Defendants continued to promote their Paraquat-based products as safe.

18   105.   In fact, in 2003, when Syngenta was dealing with lawsuits regarding

19   another toxic herbicide, atrazine, it was reported that "Sherry Ford, the communications

20   manager, wrote in her notebook that the company 'should not phase out [atrazine] until

21   we know about' the Syngenta herbicide Paraquat, which has also been controversial,

1   because of studies showing that it might be associated with Parkinson's disease. She

2   noted that atrazine 'focuses attention away from other products.'"[22]

3        106.   Defendants' failure to adequately warn Plaintiff resulted in: (1) Plaintiff

4   being exposed to Paraquat; and (2) scientists and physicians failing to warn and instruct

5   the public, particularly those living in agricultural areas where Paraquat-based pesticides

6   are heavily sprayed, about the risk of Parkinson's disease and renal disease with exposure

7   to Paraquat.

8        107.   By reason of the foregoing, Plaintiff is severely and permanently injured.

9        108.   By reason of the foregoing acts and omissions, as a result of Defendants'

10  actions and inactions, Plaintiff has endured and continues to suffer, emotional and

11  mental anguish, medical expenses, and other economic and non-economic damages.

12       109.   Plaintiff was regularly exposed to Paraquat as a result of direct exposure

13  in handling, mixing, spraying and applying Paraquat products.

14       110.   Plaintiff subsequently began experiencing symptoms of Parkinson's

15  disease and was officially diagnosed with Parkinson's disease in approximately

16  November 2017.

17       111.   As a result of Plaintiff's injuries, Plaintiff has incurred significant economic

18  and non-economic damages.

19       112.   Plaintiff was directly exposed to Defendants' Paraquat products from

20  approximately 1989 to 1997.

---

[22] Rachel Aviv, *A Valuable Reputation*, The New Yorker, (Feb 3, 2014), https://www.newyorker.com/magazine/2014/02/10/a-valuable-reputation

113.    From 1989 to 1997, Plaintiff's mother owned 40 acres of almond trees and 20 acres of peach trees on her farm in Turlock, California. Plaintiff worked as a farm hand on his mother's farm. Plaintiff held a restricted-use-pesticide license from the State of California to spray Paraquat products on his mother's farm. Plaintiff mixed, loaded, and applied Paraquat products on his mother's farm from approximately 1989 to 1997.

114.    During the entire time that Plaintiff was exposed to Paraquat, Plaintiff did not know that exposure to Paraquat when handled according to the instructions could be injurious to herself or others.

115.    Plaintiff first learned that exposure to Paraquat can cause Parkinson's disease, renal disease, and other serious illnesses sometime after November 2021.

## VI.    Causes of Action

**a.    <u>Count 1: Negligence</u>**

116.    Plaintiff re-alleges each paragraph above as if fully set forth herein.

117.    Defendants had a duty to exercise ordinary care in the designing, researching, testing, manufacturing, marketing, supplying, promoting, packaging, sale, and/or distribution of Paraquat products into the stream of commerce, including a duty to assure that the product would not cause those exposed to it to suffer unreasonable and dangerous side effects.

118.    Defendants failed to exercise ordinary care in the designing, researching, testing, manufacturing, marketing, supplying, promoting, packaging, sale, quality assurance, quality control, and/or distribution of Paraquat products in that Defendants knew or should have known that persons foreseeably exposed to Paraquat products were

placed at a high risk of suffering unreasonable and dangerous side effects, including, but not limited to, the development of Parkinson's disease or renal disease, as well as other severe and personal injuries that are permanent and lasting in nature; physical pain and mental anguish, including diminished enjoyment of life; and a need for lifelong medical treatment, monitoring, and/or medications.

119.   The negligence by Defendants, their agents, servants, and/or employees, included but was not limited to the following acts and/or omissions:

a.   Manufacturing, producing, promoting, formulating, creating, and/or designing Paraquat products without thorough testing;

b.   Failing to test Paraquat products and/or failing to adequately, sufficiently, and properly test Paraquat products;

c.   Not conducting sufficient testing programs to determine whether Paraquat products were safe for use—Defendants knew or should have known that Paraquat products were unsafe and unfit for use because of the dangers to those exposed to it;

d.   Not conducting sufficient testing programs and studies to determine Paraquat products' effects on human health even after Defendants had knowledge of studies linking Paraquat products to latent neurological damage and neurodegenerative disease, including Parkinson's disease, and renal disease;

e.   Negligently failing to adequately and correctly warn the Plaintiff, the public, the medical and agricultural professions, and the EPA of the dangers of Paraquat products;

f.   Failing to provide adequate cautions and warnings to protect the health of persons who would reasonably and foreseeably be exposed to Paraquat products;

g.   Negligently marketing, advertising, and recommending the use of Paraquat products without sufficient knowledge as to its dangerous propensities;

h.   Negligently representing that Paraquat products were safe for use for its intended purpose when, in fact, it was unsafe;

i.   Negligently representing that Paraquat products had equivalent safety and efficacy as other forms of herbicides;

PLAINTIFF'S ORIGINAL COMPLAINT

j.   Negligently designing Paraquat products in a manner that was dangerous to others;

k.   Negligently manufacturing Paraquat products in a manner that was dangerous to others;

l.   Negligently producing Paraquat products in a manner that was dangerous to others;

m.   Negligently formulating Paraquat products in a manner that was dangerous to others;

n.   Concealing information from the Plaintiff while knowing that Paraquat products were unsafe, dangerous, and/or non-conforming with EPA regulations;

o.   Improperly concealing and/or misrepresenting information from the Plaintiff, scientific and medical professionals, and/or the EPA, concerning the severity of risks and dangers of Paraquat products compared to other forms of herbicides; and

p.   Negligently selling Paraquat products with a false and misleading label.

120.   Defendants under-reported, underestimated, and downplayed the serious dangers of Paraquat products.

121.   Defendants were negligent in the designing, researching, supplying, manufacturing, promoting, packaging, distributing, testing, advertising, warning, marketing, and selling of Paraquat products in that Defendants:

a.   Failed to use ordinary care in designing and manufacturing Paraquat products so as to avoid the aforementioned risks to individuals when Paraquat was used as an herbicide;

b.   Failed to accompany Paraquat products with proper and/or accurate warnings regarding all possible adverse effects associated with exposure to Paraquat;

c.   Failed to warn Plaintiff of the severity and duration of such adverse effects, as the warnings given did not accurately reflect the symptoms, or severity of the effects including, but not limited to, developing Parkinson's disease or renal disease;

d.   Failed to conduct adequate testing, clinical testing and post-marketing surveillance to determine the safety of Paraquat products;

1        e.    Misrepresented the evidence of Paraquat's neurotoxicity; and

2        f.    Was otherwise careless and/or negligent.

3    122.   Despite the fact that Defendants knew or should have known that Paraquat

4    products caused, or could cause, unreasonably dangerous health effects, Defendants

5    continue to market, manufacture, distribute, and/or sell Paraquat products to

6    consumers.

7    123.   Defendants knew or should have known that consumers like Plaintiff

8    would foreseeably suffer injury as a result of Defendants' failure to exercise ordinary care.

9    124.   Defendants' negligence was the proximate cause of Plaintiff's injuries, harm

10   and economic loss, which Plaintiff suffered and will continue to suffer.

11   125.   As a result of the foregoing acts and omissions, Plaintiff suffers from

12   Parkinson's disease and related health issues, which are permanent and lasting in nature,

13   physical disability, mental anguish, including diminished enjoyment of life, as well as

14   financial expenses for hospitalization and medical care.

15   126.   Plaintiff therefore requests that this Court enter judgment in Plaintiff's

16   favor for compensatory and punitive damages, together with interest, costs herein

17   incurred, attorneys' fees, and all relief as this Court deems just and proper.

18   b.   **Count 2: Strict Products Liability (Design Defect)**

19   127.   Plaintiff re-alleges each paragraph above as if fully set forth herein.

20   128.   At all times herein mentioned and as described above, Defendants

21   designed, researched, manufactured, tested, advertised, promoted, sold, and/or

distributed Paraquat products to which Plaintiff was exposed, including in the State of California.

129.    Paraquat products were expected to and did reach the usual consumers, handlers, and persons coming into contact with it without substantial change in the condition in which they were produced, manufactured, sold, distributed, and/or marketed by Defendants; including in the State of California.

130.    At those times, Paraquat products were in an unsafe, defective condition that was unreasonably dangerous to users, and in particular, Plaintiff.

131.    For at least five years, Plaintiff was regularly and repeatedly exposed to Defendants' Paraquat products in the State of California resulting in regular, repeated, and prolonged exposure of Plaintiff to Paraquat.

132.    The Paraquat products designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and/or distributed by Defendants were defective in design or formulation in that, when they left the hands of the manufacturer and/or suppliers, the foreseeable risks exceeded the benefits associated with the design or formulation of the Paraquat products.

133.    The Paraquat products designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and/or distributed by Defendants were defective in design and/or formulation, in that, when they left the hands of Defendants or their manufacturers and/or suppliers, they were unreasonably dangerous, unreasonably dangerous in normal use, and they were more dangerous than an ordinary consumer

PLAINTIFF'S ORIGINAL COMPLAINT

1  would expect. On balance, the unreasonable risks posed by Paraquat products

2  outweighed the benefits of their design.

3       134.   At all relevant times, Paraquat products were in a defective condition and

4  unsafe, and Defendants knew or had reason to know they were defective and unsafe,

5  especially when used in the form and manner as intended by Defendants. In particular,

6  the Paraquat products were defective in the following ways:

7             a.    Paraquat products were designed, manufactured, formulated, and
8                   packaged such that when so used, Paraquat was likely to be inhaled,
9                   ingested, and absorbed into the bodies of persons who used them,
10                  while they were being used, or entered fields or orchards where they
11                  have been sprayed or areas near where they had been sprayed; and

12            b.    when inhaled, ingested, or absorbed into the bodies of persons who
13                  used them, were nearby while they were being used, or entered
14                  fields or orchards where they had been sprayed or areas near where
15                  they had been sprayed, Paraquat was likely to cause or contribute to
16                  cause latent, permanent, and cumulative neurological or renal
17                  damage, and repeated neurodegenerative disease, including
18                  Parkinson's disease to develop over time and manifest long after
19                  exposure.

20      135.   In breach of their duty to Plaintiff, Defendants acted negligently, and in

21  conscious disregard for the safety of others:

22            a.    failed to design, manufacture, formulate, and package Defendants'
23                  Paraquat products to make Paraquat unlikely to be inhaled,
24                  ingested, and absorbed into the bodies of persons who used them,
25                  were nearby while they were being used, or entered fields or
26                  orchards where they had been sprayed or areas near where they had
27                  been sprayed;

28            b.    designed and manufactured Paraquat and designed and formulated
29                  Defendants' Paraquat products such that when inhaled, ingested, or
30                  absorbed into the bodies of persons who used Defendants' Paraquat
31                  products, were nearby while they were being used, or entered fields
32                  or orchards where they had been sprayed or areas near where they
33                  had been sprayed, Paraquat was likely to cause latent, cumulative,

and permanent neurological or renal damage, and repeated exposures were likely to cause or contribute to cause clinically significant renal or neurodegenerative disease, including Parkinson's disease, to develop over time and manifest long after exposure;

c.    failed to perform adequate testing to determine the extent to which exposure to Paraquat was likely to occur through inhalation, ingestion, and absorption; into the bodies of persons who used them, were nearby while they were being used, or entered fields or orchards where they had been sprayed or areas near where they had been sprayed;

d.    failed to perform adequate testing to determine the extent to which spray drift from Defendants' Paraquat products was likely to occur, including their propensity to drift, the distance they were likely to drift, and the extent to which Paraquat spray droplets were likely to enter the bodies of persons spraying Defendants' Paraquat products or nearby during or after spraying;

e.    failed to perform adequate testing to determine the extent to which Paraquat, when inhaled, ingested, or absorbed into bodies of persons who used Defendants' Paraquat products, were nearby while they were being used, or entered fields or orchards where they had been sprayed or areas near where they had been sprayed, was likely to cause or contribute to cause latent, cumulative, and permanent neurological or renal damage, and the extent to which repeated exposures were likely to cause or contribute to cause clinically significant renal or neurodegenerative disease, including Parkinson's disease, to develop over time and manifest long after exposure;

f.    failed to perform adequate testing to determine the extent to which Paraquat, when formulated or mixed with surfactants or other pesticides, and inhaled, ingested, or absorbed into the bodies of persons who used Defendants' Paraquat products, were nearby while they were being used, or entered fields or orchards where they had been sprayed or areas near where they had been sprayed, was likely to cause or contribute to cause latent, cumulative, and permanent neurological or renal damage, and the extent to which repeated exposures were likely to cause or contribute to cause significant renal or neurodegenerative disease, including Parkinson's disease, to develop over time and manifest long after exposure;

g.    failed to direct that Defendants' Paraquat products be used in a manner that would have made it unlikely for Paraquat to have been inhaled, ingested, or absorbed into the bodies of persons who used Defendants' Paraquat products, were nearby while they were being used, or entered fields or orchards where they had been sprayed or areas near where they had been sprayed; and

h.    failed to warn that when inhaled, ingested, or absorbed into the bodies of persons who used Defendants' Paraquat products, were nearby while they were being used, or entered fields or orchards where they had been sprayed or areas near where they had been sprayed, Paraquat was likely to cause or contribute to cause significant renal or neurodegenerative disease, including Parkinson's disease, to develop over time and manifest long after exposure.

136.    Defendants knew or should have known that at all relevant times that their Paraquat products were in a defective condition and were (and are) unreasonably dangerous and unsafe and would create a substantial risk of harm to persons who used them, were nearby while Paraquat products were being used, or entered fields or orchards where Paraquat products had been sprayed or areas near where Paraquat products had been sprayed.

137.    Armed with this knowledge, Defendants voluntarily designed their Paraquat products with a dangerous condition knowing that in normal, intended use, consumers such as Plaintiff would be exposed to it.

138.    Plaintiff was exposed to Paraquat without knowledge of Paraquat's dangerous characteristics.

139.    At the time of Plaintiff's exposure to Paraquat, Paraquat was being used for the purposes and in a manner normally intended, as a broad-spectrum pesticide.

140.   The Paraquat products designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and/or distributed by Defendants reached their intended users in the same defective and unreasonably dangerous condition in which it was manufactured.

141.   Defendants designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and/or distributed a defective product, which created an unreasonable risk to the consumer and to Plaintiff in particular, and Defendants are therefore strictly liable for the injuries sustained by Plaintiff.

142.   Plaintiff could not, by the exercise of reasonable care, have discovered Paraquat's defects herein mentioned or perceived its danger.

143.   Defendants are thus strictly liable to Plaintiff for the manufacturing, marketing, promoting, distribution, and/or selling of a defective product.

144.   Defendants' defective design of Paraquat products amounts to willful, wanton, and/or reckless conduct.

145.   As a direct and proximate result of the defects in Defendants' Paraquat products were the cause or a substantial factor in causing Plaintiff's injuries.

146.   As a result of the foregoing acts and omissions, Plaintiff suffered severe and personal injuries as alleged above that are permanent and lasting in nature, physical pain, and mental anguish, including diminished enjoyment of life, and financial expenses for hospitalization and medical care.

147.    Plaintiff thus requests that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all relief as this Court deems just and proper.

**c.    Count 3: Strict Products Liability (Failure to Warn)**

148.    Plaintiff re-alleges each paragraph above as if fully set forth herein.

149.    Defendants engaged in the business of selling, testing, distributing, supplying, manufacturing, marketing, and/or promoting Paraquat in the State of California, and through that conduct have knowingly and intentionally placed Paraquat into the stream of commerce with full knowledge that it reaches consumers such as Plaintiff who was exposed to it through ordinary and reasonably foreseeable uses.

150.    Defendants did in fact sell, distribute, supply, manufacture, and/or promote Paraquat products. Additionally, Defendants expected the Paraquat that they were selling, distributing, supplying, manufacturing, and/or promoting to reach Plaintiff without any substantial change in the condition of the product from when it was initially distributed.

151.    At the time of manufacture, Defendants knew, or in the exercise of ordinary care, should have known that:

    a.    Defendants' Paraquat products were designed, manufactured, formulated, and packaged such that it was likely to be inhaled, ingested, and absorbed into the bodies of people who used it, who were nearby when it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed; and

    b.    when inhaled, ingested, or absorbed into the body, it was likely to cause latent neurological or renal damage that was both permanent

1  and cumulative, and that repeated exposures were likely to cause
2  renal or neurodegenerative disease, including Parkinson's disease.

3  152. At all relevant times, Defendants' Paraquat products were in a defective

4  condition such that it was unreasonably dangerous to those exposed to them and was so

5  at the time they were distributed by Defendants and at the time Plaintiff was exposed to

6  and/or ingested the product. The defective condition of Paraquat was due in part to the

7  fact that it was not accompanied by proper warnings regarding its toxic qualities and

8  possible health effects, including, but not limited to, developing Parkinson's disease or

9  renal disease as a result of exposure. That defective condition was not a common

10 propensity of the Paraquat products that would be obvious to a user of those products.

11 153. Defendants' Paraquat products did not contain a necessary warning or

12 caution statement that, if complied with, would have been adequate to protect the health

13 of those exposed in violation of 7 U.S.C. § 136j(a)(1)(E).

14 154. Defendants failed to include a necessary warning or caution statement that,

15 if complied with, would have been adequate to protect the health of those exposed.

16 155. Defendants could have revised Paraquat's label to provide additional

17 warnings.

18 156. This defect caused serious injury to Plaintiff, who was exposed to Paraquat

19 in its intended and foreseeable manner.

20 157. At all relevant times, Defendants had a duty to properly design,

21 manufacture, compound, test, inspect, package, label, distribute, market, examine,

1   maintain supply, provide proper warnings, and take such steps to assure that the product

2   did not cause users to suffer from unreasonable and dangerous side effects.

3        158.    Defendants labeled, distributed, and promoted a product that was

4   dangerous and unsafe for the use and purpose for which it was intended.

5        159.    Defendants failed to warn of the nature and scope of the health risks

6   associated with Paraquat, namely its toxic properties and its propensity to cause or serve

7   as a substantial contributing factor in the development of Parkinson's disease or renal

8   disease.

9        160.    Defendants knew of the probable consequences of exposure to Paraquat.

10   Despite this fact, Defendants failed to exercise reasonable care to warn of the dangerous

11   toxic properties and risks of developing Parkinson's disease or renal disease from

12   Paraquat exposure, even though these risks were known or reasonably scientifically

13   knowable at the time of distribution. Defendants willfully and deliberately failed to avoid

14   the consequences associated with its failure to warn, and in doing so, acted with

15   conscious disregard for Plaintiff's safety.

16        161.    At the time of exposure, Plaintiff could not have reasonably discovered any

17   defect in Paraquat through the exercise of reasonable care.

18        162.    Defendants, as manufacturers and/or distributors of Paraquat, are held to

19   the level of knowledge of an expert in the field. There was unequal knowledge with

20   respect to the risk of harm, and Defendants, as manufacturers of Paraquat products

21   possessed superior knowledge and knew or should have known that harm would occur

22   in the absence of a necessary warning.

163.    Plaintiff reasonably relied on the skill, superior knowledge, and judgment of Defendants.

164.    Had Defendants properly disclosed the risks associated with Paraquat, Plaintiff would have taken steps to avoid exposure to Paraquat.

165.    The information that Defendants provided failed to contain adequate warnings and precautions that would have enabled users to use the product safely and with adequate protection. Instead, Defendants disseminated information that was inaccurate, false, and misleading and that failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries associated with use of and/or exposure to Paraquat; continued to promote the efficacy of Paraquat, even after they knew or should have known of the unreasonable risks from exposure; and concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of exposure to Paraquat.

166.    To this day, Defendants have failed to adequately warn of the true risks of exposure to Paraquat, including the risks manifested by Plaintiff's injuries associated with exposure to Paraquat.

167.    As a result of its inadequate warnings, Paraquat was defective and unreasonably dangerous when it left Defendants' possession and/or control, was distributed by Defendants, and when Plaintiff was exposed to it.

168.    As a direct and proximate result, Plaintiff developed Parkinson's disease, and suffered severe and personal injuries that are permanent and lasting in nature,

physical pain and mental anguish, including diminished enjoyment of life, and financial expenses for hospitalization and medical care.

169.    Plaintiff thus request that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all relief as this Court deems just and proper.

**d.    Count 4: Public Nuisance**

170.    Plaintiff re-alleges each paragraph above as if fully set forth herein.

171.    At all relevant times, Defendants were engaged in the United States Paraquat business.

172.    At all relevant times, Defendants intended and expected that Defendants' Paraquat products would be sold and used in the State of California.

173.    Defendants developed, registered, manufactured, distributed, and sold Paraquat for use in formulating Defendants' Paraquat products, and developed, registered, formulated, and distributed Defendants' Paraquat products for sale and use in the United States, including the State of California.

174.    For many years, Plaintiff was exposed to Defendants' Paraquat products in the State of California regularly and repeatedly for hours at a time, resulting in the regular, repeated, and prolonged exposure of Plaintiff to Paraquat.

175.    At all relevant times, Plaintiff had a right to a healthful environment while living and working in the State of California.

176.    Defendants owed a duty to those whom they could reasonably foresee were likely to use Defendants' Paraquat products or otherwise be in or near places where they

were being or recently had been used within the State of California, including Plaintiff and other persons, to provide and maintain a healthful environment in connection with the design, manufacture, and distribution of Paraquat for use in formulating Defendants' Paraquat products, and the design, formulation and distribution of Defendants' Paraquat products, that Defendants intended and expected to be used in the State of California.

177.    When Defendants designed, manufactured, and distributed Paraquat for use in formulating Defendants' Paraquat products, and designed, formulated, packaged, labeled, and distributed Defendants' Paraquat products, it was reasonably foreseeable and in the exercise of ordinary care Defendants knew, or in the exercise of ordinary care, should have known that:

a.    Defendants' Paraquat products were designed, manufactured, formulated, and packaged such that it was likely to be inhaled, ingested, and absorbed into the bodies of people who used it, who were nearby when it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed; and

b.    when inhaled, ingested, or absorbed into the body, it was likely to cause latent neurological or renal damage that was both permanent and cumulative, and that repeated exposures were likely to cause renal or neurodegenerative disease, including Parkinson's disease.

178.    In doing so, Defendants created a condition that was harmful to Plaintiff's health as well as the health of the general public.

179.    At all relevant times, Defendants' Paraquat products were used in a manner that was intended or directed by or reasonably foreseeable to Defendants.

180.    All persons living or working near fields or orchards spayed with Defendants' Paraquat products were and are affected at the same time.

PLAINTIFF'S ORIGINAL COMPLAINT

181.    An ordinary person of reasonable sensibilities would be disturbed by the condition created by Defendants' conduct.

182.    The interference was and is unreasonable in that it involved a significant interference with public health, public safety, or public welfare.

183.    Defendants knew or should have known their conduct would naturally or probably result in injuries to Plaintiff but continued with their conduct in reckless disregard or conscious indifference to those consequences.

184.    As a direct and proximate result of the nuisance created by Defendants, Plaintiff developed Parkinson's disease, and suffered severe and personal injuries that are permanent and lasting in nature, physical pain, and mental anguish, including diminished enjoyment of life, and financial expenses for hospitalization and medical care.

185.    Defendants' conduct resulted in a public nuisance as defined by Cal. Civ. Code. § 3479.

186.    Plaintiff thus requests that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all relief as this Court deems just and proper.

e.    **Count 5: Breach of Implied Warranty of Merchantability**

187.    Plaintiff incorporates by reference all of the above-stated paragraphs as though fully set forth therein.

188.    At all relevant times, Defendants were engaged in the business of selling Paraquat products, and was a merchant with respect to those products.

189.   At all relevant times, Defendants intended and expected that Defendants' Paraquat products would be sold and used in the State of California.

190.   Defendants developed, manufactured, distributed, and sold Paraquat for use in formulating Defendants' Paraquat products, and developed, registered, formulated, and distributed Defendants' Paraquat products for sale in the United States, including the State of California.

191.   Plaintiff was exposed Defendants' Paraquat products in the State of California regularly and repeatedly, for hours at a time, resulting in regular, repeated, and prolonged exposure to Paraquat.

192.   At the time of each sale of Defendants' Paraquat products that resulted in Plaintiff's exposure to Paraquat, Defendants impliedly warranted that Defendants' Paraquat products were of merchantable quality, including that they were fit for the ordinary purposes for which such goods were used.

193.   Defendants breached this warranty as to each sale of Defendants' Paraquat products that resulted in Plaintiff's exposure to Paraquat, in that Defendants' Paraquat products were not of merchantable quality because they were not fit for the ordinary purpose for which such goods were used by Plaintiff who was either in direct privity with Defendants through purchase of the Paraquat products or was an employee of the purchaser to whom the warranty was directly made and, therefore, an intended third-party beneficiary of such warranties.

194.   As a direct and proximate result of the breaches of the implied warranty of merchantability by Defendants, Plaintiff developed Parkinson's disease, and suffered

1   severe and personal injuries that are permanent and lasting in nature, physical pain and

2   mental anguish, including diminished enjoyment of life, and financial expenses for

3   hospitalization and medical care.

4        195.    Plaintiff thus respectfully requests that this Court enter judgment in

5   Plaintiff's favor for compensatory and punitive damages, together with interest, costs

6   herein incurred, attorneys' fees and all relief as this Court deems just and proper.

7                            **<u>DEMAND FOR JURY TRIAL</u>**

8        Plaintiff hereby demands trial by jury as to all issues.

Dated this **12** day of July, **2022.**     **Respectfully submitted,**

*s/ Dennis C. Reich*
_____

**REICH & BINSTOCK, LLP**
Dennis C. Reich
California State Bar No. 69631
4265 San Felipe St., #1000
Houston, Texas 77027
Telephone: (713) 622-7271
Fax: (713) 623-8724
Email: dreich@reichandbinstock.com

**ATTORNEYS FOR PLAINTIFF**

# EXHIBIT B

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address)*: | FOR COURT USE ONLY |
|---|---|
| Dennis C. Reich (SBN 69631)<br>Reich and Binstock LLP 4265 San Felipe, Ste. 1000, Houston, TX 77027 | |

TELEPHONE NO.: 713-622-7271   FAX NO. *(Optional)*: 713-623-8724
E-MAIL ADDRESS: dreich@reichandbinstock.com
ATTORNEY FOR *(Name)*:   Billy Hawkins

SUPERIOR COURT OF CALIFORNIA, COUNTY OF San Francisco
STREET ADDRESS: 400 McAllister Street
MAILING ADDRESS:
CITY AND ZIP CODE: San Francisco, CA 94102
BRANCH NAME:

CASE NAME:
Brian Morrison v. Sygenta Crop Protection, LLC, et al.

**ELECTRONICALLY**
**F I L E D**
*Superior Court of California,*
*County of San Francisco*
**07/12/2022**
**Clerk of the Court**
BY: KAREN VALDES
Deputy Clerk

| **CIVIL CASE COVER SHEET** | **Complex Case Designation** | CASE NUMBER: **CGC-22-600636** |
|---|---|---|
| [x] **Unlimited** (Amount demanded exceeds $25,000) [ ] **Limited** (Amount demanded is $25,000 or less) | [ ] Counter [ ] Joinder<br>Filed with first appearance by defendant (Cal. Rules of Court, rule 3.402) | JUDGE: <br>DEPT.: |

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check **one** box below for the case type that best describes this case:

**Auto Tort**
[ ] Auto (22)
[ ] Uninsured motorist (46)
**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
[ ] Asbestos (04)
[ ] Product liability (24)
[ ] Medical malpractice (45)
[ ] Other PI/PD/WD (23)
**Non-PI/PD/WD (Other) Tort**
[ ] Business tort/unfair business practice (07)
[ ] Civil rights (08)
[ ] Defamation (13)
[ ] Fraud (16)
[ ] Intellectual property (19)
[ ] Professional negligence (25)
[ ] Other non-PI/PD/WD tort (35)
**Employment**
[ ] Wrongful termination (36)
[ ] Other employment (15)

**Contract**
[ ] Breach of contract/warranty (06)
[ ] Rule 3.740 collections (09)
[ ] Other collections (09)
[ ] Insurance coverage (18)
[ ] Other contract (37)
**Real Property**
[ ] Eminent domain/Inverse condemnation (14)
[ ] Wrongful eviction (33)
[ ] Other real property (26)
**Unlawful Detainer**
[ ] Commercial (31)
[ ] Residential (32)
[ ] Drugs (38)
**Judicial Review**
[ ] Asset forfeiture (05)
[ ] Petition re: arbitration award (11)
[ ] Writ of mandate (02)
[ ] Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
[ ] Antitrust/Trade regulation (03)
[ ] Construction defect (10)
[x] Mass tort (40)
[ ] Securities litigation (28)
[ ] Environmental/Toxic tort (30)
[ ] Insurance coverage claims arising from the above listed provisionally complex case types (41)
**Enforcement of Judgment**
[ ] Enforcement of judgment (20)
**Miscellaneous Civil Complaint**
[ ] RICO (27)
[ ] Other complaint *(not specified above)* (42)
**Miscellaneous Civil Petition**
[ ] Partnership and corporate governance (21)
[ ] Other petition *(not specified above)* (43)

2. This case [x] is   [ ] is not   complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. [ ] Large number of separately represented parties
   b. [x] Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
   c. [x] Substantial amount of documentary evidence
   d. [x] Large number of witnesses
   e. [x] Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   f. [ ] Substantial postjudgment judicial supervision

3. Remedies sought *(check all that apply)*: a. [x] monetary   b. [ ] nonmonetary; declaratory or injunctive relief   c. [x] punitive
4. Number of causes of action *(specify)*:
5. This case [ ] is   [x] is not   a class action suit.
6. If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*
Date: 7/12/2022

Dennis C. Reich
_____
(TYPE OR PRINT NAME)

▶ _____
(SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

Form Adopted for Mandatory Use
Judicial Council of California
CM-010 [Rev. September 1, 2021]

**CIVIL CASE COVER SHEET**

Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740;
Cal. Standards of Judicial Administration, std. 3.10
*www.courts.ca.gov*

Contact Us

THE SUPERIOR COURT OF CALIFORNIA
COUNTY OF SAN FRANCISCO

Case Number: CGC22600636
Title: BILLY HAWKINS VS. SYNGENTA CROP PROTECTION, LLC ET AL
Cause of Action: MASS TORT
Generated: 2022-07-12 11:18 pm

Register of Actions    Parties    Attorneys    Calendar    Payments    Documents

**Please Note: The "View" document links on this web page are valid until 11:28:01 pm**
**After that, please refresh your web browser. (by pressing Command +R for Mac, pressing F5 for Windows or clicking the refresh button on your web browser)**

# Register of Actions

Show 10 entries                                                     Search: _____

| Date | Proceedings | Document | Fee |
|------|-------------|----------|-----|
| 2022-07-12 | NOTICE TO PLAINTIFF | View | |
| 2022-07-12 | MASS TORT, COMPLAINT (TRANSACTION ID # 67813061) FILED BY PLAINTIFF HAWKINS, BILLY AS TO DEFENDANT SYNGENTA CROP PROTECTION, LLC SYNGENTA AG CHEVRON U.S.A., INC NO SUMMONS ISSUED, JUDICIAL COUNCIL CIVIL CASE COVER SHEET NOT FILED CASE MANAGEMENT CONFERENCE SCHEDULED FOR DEC-14-2022 PROOF OF SERVICE DUE ON SEP-12-2022 CASE MANAGEMENT STATEMENT DUE ON NOV-21-2022 COMPLEX LITIGATION ASSIGNMENT REQUESTED BY FILING PARTIES; FEE INCLUDED IN FILING FEE | View | $1435.00 |
| 2022-07-12 | CIVIL CASE COVERSHEET FILED (TRANSACTION ID # 67813061) FILED BY PLAINTIFF HAWKINS, BILLY CASE DESIGNATED COMPLEX LITIGATION | View | |

Showing 1 to 3 of 3 entries                         Previous  1  Next